REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 1185
September Term, 2015

_____

RAHUL GUPTA

v.

STATE OF MARYLAND

_____

Graeff,
Nazarian,
Friedman,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  April 28, 2016

Rahul Gupta was charged with the first-degree murder of his friend, Mark Waugh, who died from multiple stab wounds on the floor of an apartment that Mr. Gupta shared with his girlfriend, Taylor Gould. No physical evidence definitively identified Mr. Gupta as the assailant, and Ms. Gould claimed not to remember anything from that night (all three had been out drinking with friends). But something had obviously gone wrong among the three, and as the police investigated, Mr. Gupta told an officer, among other things, that "[his] buddy and [his] girl were cheating" and that he had "killed [his] buddy." At trial in the Circuit Court for Montgomery County, Mr. Gupta contended instead that Ms. Gould had stabbed Mr. Waugh. The jury found Mr. Gupta guilty of first-degree murder, and he contends on appeal that the circuit court erred in refusing to give the jury a "missing evidence" instruction, mishandled a communication from a juror, unfairly restricted his counsel's cross-examination of Ms. Gould, and wrongfully denied his motion to suppress statements he made during interrogation. We find no reversible errors and affirm.

## I.    BACKGROUND

Mr. Gupta and Ms. Gould met while studying biomedical engineering as undergraduates at George Washington University. They began dating their senior year, graduated in May 2012, and in February 2013, Mr. Gupta moved into Ms. Gould's Silver Spring apartment.

On the night of October 12, 2013, the two went for a night out in Washington D.C.'s Dupont Circle neighborhood to celebrate Mr. Gupta's birthday. After a steak dinner, they moved to a neighboring bar where they met Mr. Waugh, a friend of Mr. Gupta's from high school, and Josh White, a friend from college. An hour and several drinks later, the group

2

relocated to another bar, where all four consumed more alcohol and split into pairs: Mr. Gupta and Mr. White went outside to smoke marijuana while Ms. Gould talked with Mr. Waugh inside. Mr. Gupta testified that during this time, Mr. White told him that Ms. Gould had been flirting with him. Ms. Gould, on the other hand, testified that she confided in Mr. Waugh that she felt uncomfortable because she thought Mr. White was flirting with her.

The conflict came to a head some time later (at yet another bar) when Mr. Waugh confronted Mr. Gupta and told him, "Your friend, [Mr. White], is trying to make a move on your girlfriend." Mr. White denied the accusation, but it was enough to break up the party—Mr. White returned to his apartment in Woodley Park, while Mr. Gupta and Ms. Gould returned to the Silver Spring apartment with Mr. Waugh. Ms. Gould testified that she wanted Mr. Waugh to return to the apartment with them to "be a witness to what had happened [between her and Mr. White] at the bar, and to help [her] tell [Mr. Gupta] what had happened." Mr. Gupta testified that he did not recall such a conversation, and that Mr. Waugh had merely accepted his invitation to return to Silver Spring with them.

The parties returned to the apartment without incident; they took shots of vodka and Mr. Gupta smoked more marijuana. Mr. Gupta testified that there was another discussion about who had been flirting with whom at the bar. Neither Mr. Gupta nor Ms. Gould could clearly recount the events occurring next, but there is no dispute that at 3:25 AM on October 13, 2013, Ms. Gould placed a call to 911 and told the operator that "my friend is . . . here and I need emergency right now," that "[h]e's not breathing," that "[t]here's blood everywhere," and that "I don't know what happened." Police officers arrived on the scene quickly and encountered a "very intoxicated" Ms. Gould at the entrance to the apartment.

3

She told the officers she wasn't sure what happened, and officers placed her in handcuffs and detained her outside the apartment, while others continued inside.

The officers who went inside found Mr. Gupta lying on the floor, groaning and "[c]overed in blood," just to the left of Mr. Waugh's body. He too was intoxicated, and when officers asked him what happened, he said, "They were cheating. My girlfriend was cheating on me. My buddy and my girlfriend were cheating. I walked in on my buddy and my girlfriend cheating. I killed my buddy." Medical technicians on the scene confirmed that Mr. Waugh was dead. The medical examiner later testified that he suffered six stab wounds as well as five "cutting injuries." One stab wound punctured a lung, another severed his jugular vein, killing him in a matter of minutes. The murder weapon, a kitchen knife, was recovered under Mr. Waugh's leg.

Officers transported Mr. Gupta and Ms. Gould to police headquarters, where they were questioned separately. While placed in a holding cell to await interrogation, Mr. Gupta blurted out to the police officer assigned to guard him, unsolicited: "[P]lease, sir, look, I fucked up. He tried to stab me, though" as well as, "[G]uy's a real dick. He tried to kill me and my family." He also screamed, two or three times, "I want a lawyer." Later, two detectives moved Mr. Gupta to an interrogation room. Before asking Mr. Gupta any questions, an officer read him his *Miranda* rights and asked whether he understood. He responded, "Yes. When do I get to—" just as the detective interrupted him to start the interrogation. Mr. Gupta did not request counsel during the rest of the interrogation, but cooperated with the detectives and answered their questions.

4

At trial, Ms. Gould testified that she did not remember much of the night because she was intoxicated and "blacking out." She had no memory of attacking Mr. Waugh and claimed that she could not have been involved because she is "not capable of doing that." Mr. Gupta's theory of the case was that Ms. Gould was the assailant, and that she was angry and upset about what had happened at the bar. He testified that Ms. Gould became even angrier when, after returning to the Silver Spring apartment, Mr. Waugh suggested that he and Mr. Gupta leave for the evening in order to give everyone time to cool off. While looking for his shoes, Mr. Gupta said, he fell and hit his head; when he got up, he saw that Mr. Waugh had been attacked. He explained that he yelled for Ms. Gould to call 911, tried to slow Mr. Waugh's bleeding, and administered CPR before emergency personnel arrived. In support of his theory, Mr. Gupta produced evidence that Ms. Gould's hairs were on the murder weapon, in blood spatter on the wall near the victim, and found in one of the victim's hands. He also tried to introduce evidence that Ms. Gould carried a knife for protection, but the State objected and the court sustained the objection. In addition, Mr. Gupta testified that he told police falsely that he had killed Mr. Waugh to keep Ms. Gould out of trouble.

The jury convicted Mr. Gupta of first-degree murder, and the court sentenced him to life imprisonment. Mr. Gupta's timely appeal followed. We will discuss additional facts below, particularly details relating to the conduct of the trial.

## II. DISCUSSION

Although there was copious physical evidence and forensic professionals featured prominently among the witnesses, the CSI testimony did not definitively plug the gaps

5

between the participants' stories. Instead, this case turned largely on credibility, particularly the relative credibility of Mr. Gupta and Ms. Gould. Mr. Gupta raises four issues on appeal[1] that we address in a slightly different order: we analyze *first* whether the circuit court violated Maryland Rule 4-326 when it responded to a communication from a juror before informing the parties of the communication; *second*, whether the court erred by refusing to give a missing evidence instruction; *third*, whether the court improperly limited the scope of Ms. Gould's cross-examination, and *fourth*, whether Mr. Gupta's statements during custodial interrogation should have been suppressed. And we find no error except as to the juror communication, an error that, we hold (for the first time in a reported decision), was harmless.

---

[1] Mr. Gupta phrased the issues as follows:

> 1. Did the trial court err, under *Cost v. State*, 417 Md. 360 (2010) by refusing to grant the defense request for a "missing evidence" jury instruction?
>
> 2. Did the trial court err by violating Md. Rule 4-326 when the court engaged in *ex parte* communications with a juror and did not provide any advance notice of the juror's inquiry to the parties?
>
> 3. Did the trial court err by unfairly terminating the cross-examination of Ms. Gould on points central to the defense theory of the case?
>
> 4. Did the trial court err by not granting Mr. Gupta's motion to suppress statements made during his custodial interrogation?

6

**A.** **The Only Challenged *Ex Parte* Communication Between The Court And Juror 18A Was Harmless.**

Although it's his second argument, we look *first* at what we find to be the strongest of Mr. Gupta's four contentions: that the circuit court violated Rule 4-326(d)(2)(C) when it communicated with an eventually-excused juror without first permitting the parties (and particularly him) the opportunity for input. Mr. Gupta is right that the court does appear, one time among the many communications from this jury, to have responded to a juror's scheduling query without first convening the parties and discussing its proposed response on the record. He is right as well that no reported Maryland appellate case has held that the State met its burden of proving that a trial court's *ex parte* communication with a juror was harmless. Until now.

Jury selection in this case began on Monday, March 2, 2015, and jurors were advised that the trial would take eight days. During *voir dire*, Juror 18A raised her hand in response to a number of questions. She advised the court and the parties that she was social friends with defense counsel's partner and that she donated to Mothers Against Drunk Driving and certain anti-gun causes, but denied that either of these associations would impair her ability to be fair and impartial. Then, in response to the question about whether jury service would cause substantial personal or financial hardship, Juror 18A revealed work and child care constraints:

> THE COURT: You also said that there would be a substantial personal or financial hardship if you were to serve in this case?
>
> PROSPECTIVE JUROR NO. 18A: Yeah, I'm sure everybody has their issues. I work for a very small non-profit, so my absence for an extended period of time will be difficult. I also

have two children at home and no child care, so if, you know, my son for instance does not have school next Tuesday and Wednesday so I'll be in a position to try to find someone to look after him if I'm here.

THE COURT: Okay. Thanks very much.

After Juror 18A stepped down from the bench, the court suggested that she be excused, but the defense objected:

THE COURT: I'm a little concerned about her child care, combined with knowing [defense counsel's partner]. Would anybody object if the court strikes her?

[THE STATE]: No.

[DEFENSE COUNSEL]: No, she's a good juror. I object.

At the close of *voir dire*, neither side struck Juror 18A, so she was seated and the trial got under way. And from the very beginning, the transcript reveals that this was a fully engaged jury. Right after opening statements, for example, a juror realized that he might know Mr. White, one of Mr. Gupta's witnesses, and advised the judge's law clerk. The law clerk told the juror to put the concern in writing, which he did, and when everyone came back from a break, the court consulted with counsel, brought the juror out, and clarified through questioning that his acquaintance was a different Josh White. The next day, some jurors told the law clerk at a break that they had heard a lot of talking in the courtroom during bench conferences, but the court determined that the jurors hadn't heard anything relating to the trial:

THE COURT: During the last break, some jurors or a juror— One juror told my law clerk that during the time that we're up here with the husher on, that there's a lot of talking in the courtroom, so much so that she wishes there would be a husher

8

for the gallery. So I did ask my law clerk to go into the—tell me if you did it any differently—to go into the jury room just now and just say there's a question from the judge, all we want is a yes or no—did anyone hear anything from the gallery that in any way is related to the trial, yes or no. And his report is that there was no affirmative responses.

I can ask them that on the record if you want me to do that.

[THE STATE]: I don't think it's necessary. We'll waive any further inquiry in that regard, but maybe an admonition to the audience.

[DEFENSE COUNSEL]: Maybe a caution to the gallery.

THE COURT: Oh yes. Of course.

As the proceedings broke for lunch that same day a juror tried to ask a question about the testimony that had just finished, to which the court responded in open court (only to say that jurors can't ask questions). Then on Friday morning, two jurors sent a note advising the court that another juror had smelled strongly of alcohol each day. In each instance— we haven't tried to catalogue all of them—the parties and the court worked well and worked together to keep the trial on track and proceeding properly. The broader point, though, is that the parties were well aware that the judge's law clerk served as the jury's initial point of contact and that the court would determine whether any communications

9

related to the case. And, importantly, nobody objected or raised any concern about proceeding in that fashion.[2]

As complicated trials often do, the testimony proceeded more slowly than all had hoped, plus snow closed the court on Thursday, March 5. So by the conclusion of proceedings on Friday, March 6, the court informed the jurors that they should plan for the trial to continue another full week, and perhaps into the week after that.

At some point after this warning, and the record doesn't reflect exactly when, Juror 18A told the law clerk that she had to attend an out-of-state conference that would prevent her from deliberating if the trial stretched into a third week. The judge advised the parties after a break on Monday afternoon, March 9, that Juror 18A had informed the law clerk that she needed to leave town the upcoming Saturday for the conference. The judge told the parties that he had directed his law clerk to tell Juror 18A that they would assess the situation as it got closer and that she would not miss her conference, then walked through different scenarios with the parties:

> THE COURT: [Juror 18A] mentioned to us, I think during voir dire that she had a conflict with next Saturday.

---

[2] In one other instance, defense counsel noticed that a juror had struggled to stay awake, and agreed to have the judge's law clerk ask if the jury needed a break and to tell them to speak up if they felt themselves getting drowsy.

By noting the absence of objection here and later, we do not mean to suggest that this issue has been waived—it hasn't been, and the State conceded as much at oral argument. *See Stewart*, 334 Md. at 226-27 (holding that a defendant did not waive his right to be present at an *ex parte* encounter between the judge and juror because he was not present at the time of the communication, and therefore had no opportunity to object when the error was committed). Instead, as we will explain, it bears on our analysis of whether the court's response to the juror was harmless.

[THE STATE]: Oh she started to raise her hand at the tail end of the testimony yesterday.

THE COURT: Yes, so she had mentioned to my law clerk, you know how do things look? Or she was concerned because she's a keynote speaker at a conference in Las Vegas and she's leaving on Saturday. So she's brought up about 3 or 4 times so I just had my law clerk—did you tell her what I told you? I just said tell her that we'll deal with it on Friday. That we're not going to stand in the way of her going to her conference. My intention is that maybe we'll be done, maybe not. If we're not we'll just see how we look on Friday and we have everybody, all 14 still going, my thought would be we can talk about this more later if you want to talk about it. My thought would be to tell her to go to Las Vegas, do your thing. Come Monday morning, excuse her once we know that we've got at least 12 or 13 people left—

[THE STATE]: Do we know how long she's going to be there?

THE COURT: —and if we find out Monday morning that we're in trouble without her, we may end up having to skip a few days. She's coming back on Wednesday. So the worst case scenario, rather than a mistrial we'll just skip a couple of days.

[THE STATE]: Have them continue deliberation assuming they started something on a Wednesday instead of on a Monday?

THE COURT: Yes, well I don't know that we need to keep her on if we're going into deliberations. I'm just saying that if we're still in trial—

[THE STATE]: If we're still presenting evidence?

THE COURT: I'm really giving you a heads-up mainly to tell you about the communication that my clerk told her you know, this won't keep you from going to Las Vegas for your conference, okay.

[DEFENSE COUNSEL]: *Thank you*.

11

[DEFENSE CO-COUNSEL]: Thank you.

(Emphasis added).

Again, nobody objected. But it's true that in this instance, the judge did not notify the parties about Juror 18A's communication with the law clerk until sometime after the law clerk had responded, albeit generally, at the court's direction.

The testimony continued, and at 3:00 PM on Thursday, March 12, Juror 18A sent a note to the judge reiterating her concern that she would not be able to attend trial on Monday, Tuesday, or Wednesday of the following week. The court notified the parties about the note on Friday, March 13, and after hearing argument (and over defense counsel's objection), decided to replace Juror 18A with an alternate at the beginning of deliberations. *See* Md. Rule 4-312 (permitting trial judges to replace with an alternate a jury member who is unable to perform his or her service). Juror 18A remained as part of the jury through closing arguments that afternoon, but was cleared to leave for her conference that weekend, and was formally dismissed immediately before deliberations began on Monday, March 16.

Mr. Gupta does not challenge the court's decision to dismiss Juror 18A itself, nor does he raise any concerns about the juror's communications with the court on Thursday, March 12 or his opportunity on Friday, March 13 for input into the court's response. Instead, he argues that the court committed reversible error a week earlier when, in response to Juror 18A's question about "how do things look," the judge directed his law clerk to respond that the court would deal with the issue later and that the trial would not stand in the way of her conference.

12

We look first to Maryland Rule 4-326(d), which requires the court to discern whether a communication from a juror *pertains to the action*. If it doesn't, the judge may respond to the juror as he or she deems appropriate. But if the communication *does* pertain to the action, the judge must notify the parties promptly, and before responding to the communication, so that they can be heard before the judge responds:

> (A)    A court official or employee who receives any written or oral communication from the jury or a juror shall immediately notify the presiding judge of the communication.
>
> (B)    The judge shall determine whether the communication pertains to the action. If the judge determines that the communication does not pertain to the action, the judge may respond as he or she deems appropriate.
>
> (C)    If the judge determines that the communication pertains to the action, the judge shall promptly, and before responding to the communication, direct that the parties be notified of the communication and invite and consider, on the record, the parties' position on any response. The judge may respond to the communication in writing, or orally in open court on the record.

Md. Rule 4-326(d)(2).

We agree with Mr. Gupta that Juror 18A's query about the progress of the trial "pertain[ed] to th[is] action." A communication "pertains to the action" for the purposes of Md. Rule 4-326(d) when it "implicate[s] the effectiveness of the juror's continued service" or concerns the juror's ability to perform his duty. *State v. Harris*, 428 Md. 700, 718 (2012). In *Harris*, for example, the Court of Appeals held that a communication by the court prior to the start of deliberations informing a juror of his grandmother's death, and asking whether he was "alright to continue," pertained to the action because it

implicated the juror's ability to continue. *Id.* at 706, 715; *see also Stewart*, 334 Md. 213, 217 (1994) (a juror's communication to a judge during the course of deliberations that she was "nervous and upset" pertained to the action because "a juror's reluctance to continue deliberating . . . cannot be divorced from the action"). More recently, in *Grade v. State*, 431 Md. 85 (2013), the Court of Appeals held that a communication from a juror to the court concerning her ability to arrive on time for deliberations fell "squarely within the ambit of Rule 4-326(d)" because it concerned "a subject, the effect of which, if acted on, could, or would, affect the make-up of the fact-finding panel as determined by the parties." 431 Md. at 100-01. Juror 18A's communication about her impending scheduling conflict bore on her ability to continue as a juror and, eventually, to deliberate. And as such, the letter of Rule 4-326(d) was violated when, through the law clerk, the court replied to Juror 18A without informing the parties of the communication or providing a chance for input.

Mr. Gupta contends, then, that this violation entitles him to a new trial. The Rule is grounded in a defendant's constitutional right to be present at every stage of his trial, Md. Const. Declaration of Rights, Art. V; *Midgett v. State*, 216 Md. 26, 36 (1958), and any jury communications pertaining to the action "constitute just such stages of trial at which the defendant is entitled to be present." *Grade*, 431 Md. at 95. As such, "it is error for the trial court to engage in [such] a communication with the jury, or jurors, off the record, and without notification to counsel, and that error is presumably prejudicial unless the State can affirmatively prove otherwise." *Id.* at 105-06 (quoting *Harris*, 428 Md. at 720-21). But if the State can prove affirmatively that the communication "had no tendency to

14

influence the verdict of the jury," the court may find that the error was harmless. *Ogundipe v. State*, 424 Md. 58, 47 (2011) (quoting *Denicolis v. State*, 378 Md. 646, 656 (2003)).

No reported opinion has actually found harmless error, but there are important and dispositive differences between those cases and this one. *Denicolis* involved an altogether different kind of communication, one that related to the elements of the crime the jury was considering. The defendant was charged with solicitation to commit murder, and after the jury retired to deliberate, it sent a note to the court asking for a definition of solicitation. 378 Md. at 651-53. The note was not time-stamped, and the record was silent as to whether the court responded. *Id.* There was no doubt, though, that the court had not informed the parties of the communication—the defense discovered the note in the record after the jury's verdict had been taken and sentence had been imposed—and there was no way to tell whether the judge responded, and if so, what the response might have been. *Id.* The Court of Appeals explained that the definition of solicitation went to the heart of the case, and made clear that "a silent record will not support a harmless error argument." *Id.* at 659. Where, unlike here, the jury's query related directly to the elements of the offense the jury was considering, it is difficult to imagine how the State, or this Court, could rule out the possibility that a communication, even an uncertain one, influenced the verdict.

But communications about *jurors* are different, and in the two cases involving communications about jurors' ability to serve—*Harris* and *Grade*—the court not only received an *ex parte* communication, but acted on it. *Harris* involved a juror whose grandmother passed away just before deliberations were scheduled to begin. 428 Md. at 705-06. Without notifying counsel that the juror's father had called with this news, and

15

outside the presence of the parties, the court informed the juror of his grandmother's death and inquired whether he was "alright to continue." *Id.* at 706. The juror indicated that he could, and the court allowed deliberations to begin and excused the alternates.[3] *Id*. The Court of Appeals found that the circuit court's actions deprived counsel of the opportunity to evaluate the emotional state of the juror and his ability to continue deliberating, and to provide input on how to proceed. *Id.* at 722. Letting the juror deliberate "created a significant risk that [he], in an effort to be able to attend the funeral, which he expressed a strong desire to do, would rush to a decision." *Id.* Had the communication been properly disclosed, alternate jurors would have been available. *Id.*

*Grade* is another step worse. At the conclusion of a jury trial, but before adjourning for the day, the court inquired whether the jury would prefer to begin deliberating immediately or wait until the following day. 431 Md. at 88-89. After determining that the jury preferred to return the next day, the court instructed both jurors and alternates to return the next morning "because something [could] happen with one of the regular jurors before deliberation begins." *Id.* at 89. Deliberations were scheduled to begin around 9:15 AM, and the court instructed counsel to return at 10:00 AM in case "questions and problems ar[o]se." *Id.* at 88. And a problem did arise: at 9:20 AM the next morning, a juror called to tell the court that an emergency would prevent her from arriving for deliberations on time. *Id.* Without consulting either party, the court actually substituted an alternate for the absent juror, and deliberations began as scheduled. *Id.* The Court held that the court's

---

[3] Shortly thereafter, the juror sent the court a note asking to be excused after all.

failure to inform the parties before replacing the juror with an alternate was prejudicial because it "necessarily deprive[d] the defense of the opportunity to provide the input on how to proceed. . . ." *Id.* at 106

In this case, the court didn't respond substantively to the juror's request. The juror communicated a scheduling concern through the channel the jury had used throughout the case, with the parties' knowledge and blessing, to communicate with the court about the mechanics of the trial. The court's response to the juror merely acknowledged the potential for a problem and promised to resolve it later. The response embodied no decisions, and the court took no action in connection with the response. Instead, the court brought the problem to the parties' attention in open court the next day, four days *before* the problem actually ripened. Only after the trial stretched to the end of the week, and only then after hearing from both sides, did the court consider replacing Juror 18A with an alternate, and Mr. Gupta does not challenge the ultimate decision to replace her on its merits.

Communications between juries or jurors and the court implicate defendants' fundamental rights, and a court that communicates with jurors without first bringing the parties together in open court and obtaining their input skates on ice that can be dangerously thin. But we also cannot forget that trials happen in real life, and that trial judges must make complex, on-the-fly decisions that strike a delicate balance among the competing rights and needs and logistics of everyone involved. We are satisfied that the circuit court's non-substantive *ex parte* response to the juror's scheduling question, attenuated as it was from any decisions about her participation in the case, could not possibly have affected the jury's deliberations or its verdict in this case, *see Dorsey v. State*, 276 Md. 638, 659 (1976)

17

(articulating the harmless error standard), and thus that the violation of Rule 4-326(d) was harmless.

**B.    The Circuit Court Did Not Err By Refusing to Give A Missing Evidence Instruction.**

Relying on *Cost v. State*, 417 Md. 360 (2010), Mr. Gupta *next* contends that the circuit court erred when it denied his request for a missing evidence instruction. A missing evidence instruction permits the jury to draw an inference that missing or destroyed evidence would have been unfavorable to the State. *Id*. at 381. He alleges that the instruction was warranted because the State failed to collect and make available to the defense three pieces of evidence, documented in crime scene photos: long blonde hairs found in the victim's hand, on the murder weapon, and in a bloodstain on the wall; Ms. Gould's shoe, documented in crime scene photos to have blood under the heel; and a knife sharpener that the State claimed Mr. Gupta handled just before the crime.

Generally, trial courts "need not instruct . . . on the presence or absence of most evidentiary inferences, including 'missing evidence' instructions." *Patterson v. State*, 356 Md. 677, 694 (1999). However, a court *must* give a requested evidence instruction when: "(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given." *Cost*, 417 Md. at 368-69 (quoting *Dickey v. State*, 404 Md. 187, 197-98 (2008)).

Still, a trial court need not grant a missing evidence instruction in any instance where "the defendant alleges non-production of evidence that the State might have introduced."

18

*Id.* at 382. Where the missing evidence "was not central to the defense case, 'was not the type of evidence usually collected by the state, or [was] not already in the state's custody . . . a trial court may be well within its rights to refuse'" the instruction. *Grymes v. State*, 202 Md. App. 70, 111 (2011) (quoting *Gimble v. State*, 198 Md. App. 610, 627-30 (2011)). We review the circuit court's jury instructions under an abuse of discretion standard, and reverse only where the instructions do not, "taken as a whole, sufficiently protect the defendant's rights and adequately cover[] the theory of the defense." *Thompson v. State*, 393 Md. 291, 311 (2006).

> Mr. Gupta proffered the following missing evidence instruction:

>> You have heard testimony in this case that certain items of evidence were not seized by investigators. You must first determine whether the items in question were probative on any issue relating to the guilt or innocence of the accused.

>> If you find that evidence was not seized, or was seized and thereafter handled in such a manner that its probative value was diminished or destroyed, you may consider this fact in determining whether the State has proven the case beyond a reasonable doubt.

In declining to give this instruction, the court explained that "[t]he instruction that's been proposed ultimately just says [to] give[] the evidence the weight you believe it deserves. And that is true of every piece of evidence . . . to give this instruction does not add anything more to that guidance . . ." We agree, for two reasons, with the circuit court's conclusion that the instruction was not necessary in this case.

*First*, the content of this instruction *was* fairly covered in the instructions the court gave. 417 Md. at 368-69. The jury instruction as defense counsel wrote it did not direct

19

jurors to make an adverse inference as a result of the missing evidence—it neutrally allowed them to consider the fact that the State did not preserve the evidence when deciding whether the State proved its case. *Contra* MPJI-CR 3:26 ("Concealment or destruction of evidence is not enough by itself to establish guilt, but may be considered as evidence of guilt."). But as the court pointed out, without an adverse inference, "it's a virtually meaningless instruction," indistinguishable from the standard instruction informing jurors of their ability to draw reasonable conclusions and inferences justified by their common sense and experience.

*Second*, the hairs, shoe, and knife sharpener, all documented in photos but never collected, were not so critical that their absence undermined the defense's theory of the case. Mr. Gupta argues for the first time in his reply brief that the blonde hairs clutched in the victim's hands were essential to his theory that Ms. Gould was the true perpetrator of the crime, because forensic testing could have shown that the victim pulled the hairs from Ms. Gould's head during a struggle. In light of their absence from the evidentiary record, he contends that the jurors should have been permitted to draw a negative inference against the State, and relies on *Cost* to argue that his case was unfairly prejudiced when the judge declined to lend his "greater gravitas" to that position by so instructing the jury. 417 Md. at 381.

It's an interesting theory, but one that defense counsel did not argue in the trial court. Only the shoe even enters into the defense's trial court theory, and then only as part of a more generic investigatory incompetence theory:

> The testimony on the handling of the scene in this case is about as close to Abbott and Costello as you can get in the criminal justice realm. Who's on first? Who was giving orders? Who was there? Who was supposed to decide what happened? And the State for whatever reason has chosen to keep the confusion level on that as high as possible by not calling the witness who can clear it up.
>
> We know that the black shoe which wasn't seized despite blood being clearly seen on top of it in the middle of the blood trail is a critical piece of evidence. We know that there are numerous other similarly situated critical pieces of evidence that could have proved the guilt of another party and the innocence of Mr. Gupta.

The trial court never had the opportunity to consider and decide the importance of the clutched hair theory in this context, and we need not address those arguments here. *See, e.g., Jones v. State*, 379 Md. 704, 713 (2004) (an appellate court ordinarily will not address an issue that was not raised or decided by the trial court). Nor do we need to consider an issue addressed for the first time in a party's reply brief. *Gazunis v. Foster*, 400 Md. 541, 538 (2007) (citing *Jones*, 379 Md. at 713).

*Finally*, Mr. Gupta rests his theory for the missing evidence instruction on *Cost*, but this case does not present the same "exceptional circumstance" that the Court of Appeals dealt with in that case. 417 Md. at 378. Mr. Cost was convicted of reckless endangerment for stabbing a fellow inmate. 417 Md. at 363. His defense was that the victim had faked the attack by injuring himself and spreading red Jell-O around his cell to look like blood. *Id.* at 366 n.1. Although he was able to shed doubt on the victim's claims through his medical records, he could not obtain a laboratory analysis on the red substance covering the victim's clothing, towel, sheets, and the floor of his cell because the scene was

completely cleaned before any testing could be conducted. *Id.* at 366, 380. The Court of Appeals held that the trial court should have granted a missing evidence jury instruction because the missing evidence went "to the heart of the case," was the type of evidence usually collected by the State, and was already in the State's custody when it was destroyed. *Id.* at 381.

By contrast, Mr. Gupta's theory that Ms. Gould was the true perpetrator did not depend on the ability to test the three hairs found in the victim's hand forensically. The defense's case rested on a wide array of other testimony and evidence, including the long, blonde hairs found on the murder weapon and in blood spatter on the wall, both documented by crime scene photos. Although the defense was unable to test those hairs to determine conclusively that they belonged to Ms. Gould, both Mr. Gupta and the victim have dark, shorter hair; indeed there was no suggestion that the hairs belonged to anyone but her, and Mr. Gupta was free to argue whatever he wanted about their provenance. In other words, unlike in *Cost*, this jury was able to assess the defense's theory of the case without this evidence being collected or tested. We see no abuse of discretion in the court's decision not to give the missing evidence instruction.

C.      **The Court Properly Limited the Scope of Ms. Gould's Cross-Examination.**

Mr. Gupta also argues that the circuit court erroneously limited the scope of his cross-examination of Ms. Gould in two instances. *First*, he contends that the court improperly prevented him from impeaching Ms. Gould with evidence that she carried a camping knife for protection after Ms. Gould testified that she could not have stabbed the

22

victim because she was "not capable of doing that" and "had no reason to hurt him." *Second*, he contends that, in light of Ms. Gould's position at trial that she did not take part in assaulting the victim, the court denied him his constitutional right to confront her with her prior statement "if I did it I don't want him to get hurt in the process."

### 1. Camping Knife

Mr. Gupta's counsel sought to cross-examine Ms. Gould about the fact that she carried a "camping knife" for protection. The defense contended that a person familiar with knives who carries one for protection is "willing to plunge it into the body of another human being if the circumstances present themselves." The court initially allowed the defense to question Ms. Gould only on the point that she carried a knife for protection, although it voiced concern about the probative value of the evidence compared to its inflammatory and prejudicial impact. The next day, however, the court reversed its decision *sua sponte*, and ordered that the evidence and testimony related to the camping knife be stricken from the record, finding that it was irrelevant, and even if it was relevant, that its prejudicial impact far outweighed any probative value:

> The determination of relevance is initially for the judge as an issue of admissibility. Irrelevant evidence is not admissible. In terms of raising this sua sponte, I'll make it clear that I do so because yesterday the issue came pretty much out of the blue in a quick fashion. And with real lack of complete confidence, in all honesty, in my ruling, I overruled the objection from the State.
>
> But I don't think I got it right, and the purpose of my being here is to do the best I can to try to get it right. And the irrelevant evidence should not be in evidence.

23

> It is in no way more likely that Ms. Gould committed this crime because at some point in time she carried what she described as a camping knife which was never used, never implicated in the crime. It is not more probable that the defendant is not guilty because Ms. Gould carried a knife at times for defense.
>
>       \*     \*     \*
>
> The Court finds that it is not relevant. Quite frankly it appears to the Court to be the classic red herring . . . I find no probative value, but even if it had some probative value that would be substantially outweighed under Rule 5-403 by the danger of the confusion of the issues and in particular of misleading the jury.

Mr. Gupta argues that the judge erred in striking the evidence from the record because it signaled to the jury the court's disapproval of the defense's theory of the case. We disagree.

Our *first* task is to tackle the threshold inquiry of whether this evidence is relevant, since irrelevant evidence is never admissible. Md. Rule 5-402. Evidence is relevant if it has the tendency to make existence of a consequential fact any more or less probable. Md. Rule 5-401. We review *de novo* a trial court's "conclusion of law that the evidence at issue is or is not of consequence to the determination of the action." *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 620 (2011) (quoting *Parker v. State*, 408 Md. 428, 437 (2009)). Only if the evidence is relevant do we move on to our *second* task: to decide whether it should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Md. Rule 5-403.

We need not reach the second inquiry here because we agree with the circuit court's assessment that the evidence was irrelevant. The knife in question was not the murder weapon, but instead a camping knife found in Ms. Gould's apartment. Carrying a knife

and "plung[ing] it into the body of another" are two very different propositions, and the fact that Ms. Gould carried a knife with her at some point does not make her more or less likely to have stabbed Mr. Waugh on the morning of October 14th. *Cf. Moore v. State*, 390 Md. 343, 349 (2005) (evidence that an accomplice to a murder had a propensity toward violence was irrelevant because it did not make it more or less likely that he committed the murder alone).

Mr. Gupta argues further that striking the evidence about the camping knife rendered him unable to undermine her credibility by highlighting supposedly inconsistent responses about when she carried the camping knife. But evidence that is irrelevant (and, for that matter, evidence that is excluded for its prejudicial effect) is never admissible, even to undermine a witness's credibility. *Smallwood v. State*, 320 Md. 300, 307-08 (1990) ("A judge must allow a defendant to cross-examine a witness as to bias or prejudices, but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion." (internal citation omitted)). We discern no error in the circuit court's decision to exclude questions about the camping knife.

### 2. "If I did it" Confession

Mr. Gupta argues that the circuit court improperly cut off Ms. Gould's cross-examination regarding her statement during a police interrogation "if I did it I don't want [Mr. Gupta] to be blamed for it," and in doing so deprived him of his Sixth Amendment right to confront the witness. The testimony at issue went as follows:

> [DEFENSE COUNSEL]: Did you listen to the video here where you said well if I did it, did you hear those words come out of your mouth?

25

[MS. GOULD]: Yes, but you're taking it out of context.

[DEFENSE COUNSEL]: Well the context was if I did it I don't want Rahul to be blamed for it, is that a fair statement of the context? It is, isn't it?

[THE STATE]: Objection.

THE COURT: Sustained. The jury will judge the evidence.

[DEFENSE COUNSEL]: Is that a fair statement of the context?

[THE STATE]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: If the Court please, she says I took it out of context I'm trying to be fair to her and put it in context.

THE COURT: The objection's sustained.

[DEFENSE COUNSEL]: The context that I just repeated was the context in which you said, if I did it et cetera, correct?

[THE STATE]: Objection.

THE COURT: Sustained, you can ask what she meant by took it out of context. But you are putting a qualif[ier] on the evidence. You're basically asking her to comment on the evidence.

We agree with the State that the court acted within its broad discretion here. A defendant's right to confront witnesses, including the opportunity for cross-examination, is guaranteed by the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights. *Martinez v. State*, 416 Md. 418, 428 (2010). But judges have "wide latitude to establish reasonable limits on cross-examination," and we

26

review these limits under an abuse of discretion standard. *Pantazes v. State*, 376 Md. 661, 680-81 (2003). An abuse of discretion occurs when the trial judge imposes limitations on cross-examination that "inhibit[] the ability of the defendant to receive a fair trial." *Id.* at 681-82.

Mr. Gupta's right to a fair trial was not so inhibited. It is, of course, proper cross-examination to confront a witness with her prior inconsistent statement in the police interrogation, as was defense counsel's initial question asking her to explain the inconsistency. *See* Md. Rules 5-613, 5-616. Ms. Gould admitted that she made the prior statement, and explained that counsel had taken it out of context. But counsel's further questions were inappropriate, argumentative, and repetitive, and the court did not abuse its discretion in cutting him off. *See Martinez*, 416 Md. at 428 (explaining that a trial court may impose reasonable limits on cross in order to prevent harassment and repetitive or irrelevant inquiries.)

As the court pointed out, it is the role of the jury to "resolve any conflicts in the evidence and assess the credibility of the witnesses." *Correll v. State*, 215 Md. App. 483, 502 (2013) (quoting *Allen v. State*, 158 Md. App. 194, 251 (2004)). Defense counsel pointed out the inconsistencies in Ms. Gould's statements, and could not force her to comment upon it beyond the response she offered. His questions were not meant to elicit new information, but to bring out his contention that her statement at the police interrogation was a statement of guilt. *See Johnson v. State*, 408 Md. 204, 224 (2009) ("An argumentative question is one which incorporates by assumption a fact not otherwise in evidence." (internal quotations and citations omitted)). Moreover, the questions were

27

repetitive, since the jury had already seen Ms. Gould's police interrogation, heard her testimony, and heard his initial question as to the inconsistent statement. Md. Rule 5-403 gives the trial court broad authority to limit repetitive and redundant questions, and the court did not abuse its discretion in doing so.

> ### D. The Court Did Not Err in Denying Mr. Gupta's Motion To Suppress His Statements During Custodial Interrogation.

*Finally*, Mr. Gupta argues that the circuit court erred by failing to suppress his statements during police interrogation on the grounds they were obtained in violation of *Miranda v. Arizona*, and therefore violated his Fifth Amendment right against self-incrimination. After a two-day suppression hearing, the circuit court found that "the defendant was advised under *Miranda*, that he made a knowing and intelligent waiver of his right to remain silent and did not assert at all, let alone without equivocation, a desire to have counsel present." Mr. Gupta disputes the circuit court's decision, and seems to argue that he was prejudiced by it because it forced him to testify in his own defense. Again, we disagree.

On review of the circuit court's denial of a motion to suppress, we are limited to the record of the suppression hearing. *Holt v. State*, 435 Md. 443, 457-58 (2013); *Longshore v. State*, 399 Md. 486, 498 (2007). We consider the evidence in the light most favorable to the prevailing party—in this case the State—and defer to the circuit court's factual findings unless clearly erroneous. *Gonzalez v. State*, 429 Md. 632, 648 (2012); *Lee v. State*, 418 Md. 136, 148 (2011); *Owens v. State*, 399 Md. 388, 403 (2007). "We also make our 'own independent constitutional appraisal[]' by reviewing the relevant law and applying it

28

to the facts and circumstances of this particular case." *Hoerauf v. State*, 178 Md. App. 292, 306 (2008) (quoting *Longshore*, 399 Md. at 499)).

The Supreme Court held in *Miranda* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). As a practical matter, this means that when a suspect is in custody, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* However, no *Miranda* warnings are required in the absence of custodial interrogation, *i.e.*, questioning initiated by law enforcement officers that is reasonably likely to elicit an incriminating response after a person has been taken into custody or otherwise deprived of his freedom. *Id.*; *see also Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). In addition, a defendant may waive his *Miranda* rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.*

Mr. Gupta contends that he validly invoked his Fifth Amendment right to counsel by voicing his demands for counsel to a police officer assigned to guard his holding cell when interrogation was imminent. He says that the police officers who later conducted his interrogation were specifically aware of these requests, and that the officers acted in a coercive manner by purposely cutting him off when he tried to ask for an attorney during the interview. At the start of his interrogation, after the detectives read Mr. Gupta his *Miranda* rights and asked whether he understood them, Mr. Gupta responded with "Yes.

When do I get to—" just as a detective spoke over him to begin the interrogation. On these grounds, Mr. Gupta argues that his statements during the custodial interrogation should be suppressed.

Although it's true that interrogation must cease until counsel is made available to a suspect who validly invokes his *Miranda* rights, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), the request for counsel must occur during the context of custodial interrogation. *McNiel v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (pointing out that the Supreme Court "ha[s] in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"). Our courts have interpreted this principle to mean that a defendant does not validly invoke his Fifth Amendment right to counsel if he makes generalized requests for an attorney while in custody, rather than during his interrogation and in response to being read his *Miranda* rights. *See Fenner v. State*, 381 Md. 1, 9 (2004) ("[I]n order for *Miranda* safeguards to take effect, there must first exist custodial interrogation."); *Costley v. State*, 175 Md. App. 90, 111 (2007) ("[C]ustody, absent interrogation, is insufficient."). Even if interrogation is imminent, the defendant validly invokes his Fifth Amendment rights only in the "compelling atmosphere[] and its corresponding danger of inherent compulsion" that *Miranda* is designed to guard against. *Williams v. State*, 219 Md. App. 295, 322 (2014), *aff'd* 445 Md. 452 (2015) (internal citation and quotation omitted).

In *Williams*, this Court[4] held that a defendant's comment ("I don't want to say nothing. I don't know—") was made in the context of custodial interrogation, *even though the interrogation had not yet commenced*, when he was placed in an interrogation room in close proximity to two police officers who told him that they would shortly advise him of his *Miranda* rights, and when interrogation was imminent. *Id.* By contrast, in *Costley*, we held that the defendant did not validly invoke his Fifth Amendment right to counsel when he requested an attorney from the officer who placed him in a holding cell before interrogation began. 175 Md. App. at 110. And in *Hoerauf*, we held that a defendant who asked to call his mother, an attorney, several times during fingerprinting and while being held in a cell prior to interrogation did not validly invoke his Fifth Amendment right to counsel. 178 Md. App. at 318.

To the extent Mr. Gupta requested counsel in his holding cell, he did so *prior to* interrogation. He did not do so *during* custodial interrogation, even after the detectives read him his *Miranda* rights, and even though, as the circuit court put it, he was "highly educated" and "certainly was capable of asserting his right to counsel." Even if we assume that his statement "When do I get to—" was an attempt to ask for counsel, nothing stopped Mr. Gupta from asserting his right and refusing to answer the detectives' questions. *See Williams*, 445 Md. at 475 (explaining that a defendant's request must be unambiguous, meaning that "a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to silence."). He didn't, and we see no error in

---

[4] The Court of Appeals affirmed our holding in *Williams* but did not address this issue.

31

the circuit court's conclusion that Mr. Gupta's conduct was a valid waiver of his *Miranda*

rights.

                                        **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**