*Rahul Gupta v. State of Maryland*, No. 36, September Term, 2016.  Opinion by Getty, J.

**CRIMINAL LAW & PROCEDURE — JURY COMMUNICATIONS**

Juror's communication to trial judge's law clerk that she would be unable to continue serving if trial lasted beyond two weeks "pertained to the action" under Maryland Rule 4-326(d)(2).  Trial judge violated the Rule by responding to juror's inquiry off the record and without notifying the parties of the communication.  However, violation was harmless where trial judge subsequently notified the parties of the juror communication and response, provided the parties an opportunity to offer input on how to resolve the situation with the juror, and considered and rejected defense counsel's suggestions on the record prior to ultimately dismissing the juror before deliberations.

**CONSTITUTIONAL CRIMINAL PROCEDURE — FIFTH AMENDMENT — RIGHT TO COUNSEL — INVOCATION**

Suspect did not invoke *Miranda* right to counsel by demanding to see a lawyer while in a holding cell awaiting interrogation, where no such demands were made to the detectives who interrogated him at any point after being advised of his rights and the interrogation began.  Therefore, circuit court did not err in denying suspect's motion to suppress the statements he made to detectives during the interrogation.

Circuit Court for Montgomery County
Case No. 124077C
Argued: December 5, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 36

September Term, 2016

RAHUL GUPTA

v.

STATE OF MARYLAND

Barbera, C.J.
Greene,
Adkins,
McDonald,
Hotten,
Getty,
Rodowsky, Lawrence F.
   (Senior Judge, Specially Assigned),

JJ.

Opinion by Getty, J.
Barbera, C.J., Adkins and McDonald,
JJ., concur.

Filed: March 24, 2017

In this case we are asked to determine whether a trial judge's *ex parte* communication with a juror violated Maryland Rule 4-326(d)(2) and, if so, whether such violation was harmless. In addition, we must determine whether a suspect can invoke his right to counsel under *Miranda*[1] by demanding to see a lawyer while in a holding cell before interrogation begins.

For the reasons that follow, we conclude that although the trial judge did violate Rule 4-326(d)(2), that error was harmless beyond a reasonable doubt. In addition, we hold that the Petitioner did not invoke his *Miranda* right to counsel by demanding to see a lawyer from his holding cell before being interrogated, and therefore the circuit court did not err in denying the Petitioner's motion to suppress the statements he made to detectives during his interrogation. Accordingly, we will affirm the judgment of the Court of Special Appeals.

**BACKGROUND**

### A.     *The Murder*

On Saturday, October 12, 2013, Petitioner Rahul Gupta and his girlfriend, Taylor Gould, went out to dinner in the Dupont Circle neighborhood of Washington, D.C. to celebrate Mr. Gupta's twenty-fourth birthday. After dinner, the couple walked to a nearby bar, where they met up with two of Mr. Gupta's friends—Mark Waugh and Josh White. Approximately an hour later, the group moved to another nearby bar, at which point they split up into pairs. Mr. Gupta went outside with Mr. White, while Mr. Waugh remained

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

inside the bar with Ms. Gould. Mr. Gupta testified that he went outside with Mr. White to smoke marijuana. He also testified that, during this time, Mr. White told Mr. Gupta that he thought Ms. Gould was flirting with him. Meanwhile, inside the bar, Ms. Gould confided in Mr. Waugh that she felt like Mr. White was hitting on her, and it was making her uncomfortable.

Later, after the group had moved to a third bar, Mr. Waugh confronted Mr. Gupta about the situation between Ms. Gould and Mr. White, telling Mr. Gupta that Mr. White was "trying to make a move on" Ms. Gould. Mr. White denied the accusation, and decided at that time to return to his apartment in the Woodley Park neighborhood of Washington, D.C. Mr. Gupta and Ms. Gould also decided to call it a night, and the couple took a taxi back to the apartment they shared in Silver Spring, Maryland, accompanied by Mr. Waugh.

Surveillance cameras in the Silver Spring apartment building show that the trio arrived at 1:50 a.m. on Sunday, October 13, 2013. Once inside the apartment, they took shots of vodka, Mr. Gupta smoked more marijuana, and all three sat on the couch and began playing video games. At some point, there was another discussion about whether there had been any flirting between Ms. Gould and Mr. White earlier in the night. Ms. Gould testified that Mr. Waugh helped her confront Mr. Gupta about the perceived flirting by Mr. White, while Mr. Gupta testified that Mr. Waugh did not believe Ms. Gould's accusation that Mr. White was "hitting on her."

Both Mr. Gupta and Ms. Gould claimed that they could not clearly remember the events following this discussion, as both had been drinking heavily throughout the night. But at 3:25 a.m., Ms. Gould called 911 at Mr. Gupta's direction. She told the operator that

2

"my friend is . . . here and I need emergency right now," that "he's not breathing," and that "there's blood everywhere." When the operator asked Ms. Gould what had happened, she relayed the question to Mr. Gupta, and then responded to the operator, "I don't know what happened."

Police officers arrived at the apartment at 3:36 a.m., and encountered a "very intoxicated" Ms. Gould at the front door. She repeated to the officer that she did not know what happened, and they placed her in handcuffs and detained her outside the apartment. The officers who entered the apartment found Mr. Gupta groaning and covered in blood, lying on the floor just to the left of Mr. Waugh's body. When the officers asked Mr. Gupta what happened, he responded, "They were cheating. My girlfriend was cheating on me. My buddy and my girlfriend were cheating. I walked in on my buddy and my girlfriend cheating. I killed my buddy." Medical technicians on the scene confirmed that Mr. Waugh was dead. The medical examiner testified that Mr. Waugh had six stab wounds and five "cutting injuries." Police recovered an eight-inch kitchen knife, identified as the murder weapon, from under Mr. Waugh's leg.

## B.  *The Interrogation and Suppression Hearing*

Police officers transported Mr. Gupta and Ms. Gould, separately, to the Major Crimes Division of the Montgomery County Police Department. Once there, they placed Mr. Gupta in a holding cell to await interrogation. In the holding cell, at 5:05 a.m., Mr. Gupta screamed at Officer Andrew Richardson, who was stationed nearby to keep an eye on Mr. Gupta, that he was "going to sue the shit out of all of you." Mr. Gupta also pounded on the door of his cell, and screamed—two to three times—"I want a lawyer."

3

Approximately ten to thirty minutes later, according to Officer Richardson's estimate, Detectives Paula Hamill and Kathy Fumagalli arrived to speak with Mr. Gupta and Ms. Gould. Officer Richardson relayed to the detectives Mr. Gupta's request for a lawyer. At the suppression hearing, Detective Fumagalli testified that she remembered receiving this information, while Detective Hamill testified that she did not remember learning that Mr. Gupta had requested a lawyer.

The detectives spoke to Ms. Gould first. Then, at 8:10 a.m., they moved Mr. Gupta from the holding cell into an interview room and began questioning him. After answering some preliminary questions about his background and current state of mind, Detective Hamill read Mr. Gupta his *Miranda* rights and asked him whether he understood those rights. Mr. Gupta responded, "Yes." After about eight seconds of silence, Mr. Gupta asked, "When do I get to talk . . .," before Detective Hamill interrupted him by stating, "Okay, do you . . . here's the deal. We're just trying to find out what the heck happened. You know what I mean?" Mr. Gupta cooperated with the detectives and answered their questions throughout the fifty-five-minute interrogation, and did not request to see or speak to a lawyer until approximately one hour after the interrogation had ended. At trial, the State questioned Mr. Gupta on cross-examination regarding some of the statements he had made during the interrogation. The statements themselves were not admitted into evidence.

The State charged Mr. Gupta with first- and second-degree murder in the Circuit Court for Montgomery County. Prior to trial, Mr. Gupta filed a motion to suppress the statements he made to police officers on the morning of his arrest. Specifically, and relevant to this appeal, Mr. Gupta argued that the statements he made while being

4

interrogated by Detectives Hamill and Fumagalli should be suppressed because they were obtained in violation of his right to have counsel present during questioning under *Miranda*. Mr. Gupta asserted that his demands to see a lawyer while he was in the holding cell awaiting interrogation were made "in the context of custodial interrogation" or when interrogation was "imminent." Upon learning of these requests, the detectives were required to cease questioning until Mr. Gupta had a chance to speak with a lawyer. Therefore, Mr. Gupta concluded, any statements he made to the detectives during the interrogation must be suppressed as being obtained in violation of his *Miranda* right to counsel.

Following a suppression hearing on July 30 and 31, 2014, the circuit court denied Mr. Gupta's motion to suppress. The court found that Mr. Gupta had requested a lawyer "two to four times . . . while in custody before interrogation took place," and that "that communication was passed along to the detectives," or at least to Detective Fumagalli, by Officer Richardson. However, the court concluded that these demands did not equate to an invocation of the right to counsel under *Miranda*, because they were made prior to interrogation. Furthermore, the court found that Mr. Gupta was advised of his *Miranda* rights, "that he made a knowing and intelligent waiver" of those rights, and that he "did not assert at all, let alone without equivocation, a desire to have counsel present."

## C.     *The Trial*

Mr. Gupta's trial began on Monday, March 2, 2015. During jury selection, the court advised the potential jurors that the trial was scheduled to "take eight days to try to completion," meaning it would likely last until Wednesday of the following week, March

5

11. The court asked if anyone would be unable to serve during that time due to a substantial personal or financial hardship. Prospective Juror 18A, along with many others, responded in the affirmative. When questioned individually about her response, Juror 18A explained that she works "for a very small non-profit, so [her] absence for an extended period of time will be difficult." Additionally, she stated that she had "two children at home and no child care," so she would "be in a position to try to find somebody to look after" them during the trial.

These answers, along with the fact that Juror 18A stated that she was social friends with defense counsel's partner, caused the court concern. The court then asked if there would be any objection to striking this juror, to which the State responded, "No." Defense counsel did object, however, and stated that "she's a good juror." Juror 18A remained on the jury panel, and ultimately became a member of Mr. Gupta's jury.

On Thursday, March 5, the circuit court was closed due to snow. At the close of proceedings on Friday, March 6, the court told the jury that the trial was taking longer than originally expected. Thus, the court told the jurors to prepare to serve until the following Friday, March 13, and, "out of an abundance of caution, some days after that." The court instructed the jurors to make the court aware when they returned the following Monday if they foresaw any potential conflicts with serving during that period of time.

On Monday, March 9, during an afternoon recess, the court informed the parties that Juror 18A had raised a potential conflict with continuing to serve beyond the end of that week:

6

THE COURT: [Juror 18A] had mentioned to us, I think during voir dire that she had a conflict with next Saturday.

[THE STATE]: Oh she started to raise her hand at the tail end of the testimony yesterday [sic].

THE COURT: Yes, so she had mentioned to my law clerk, you know how do things look? Or she was concerned because she's a keynote speaker at a conference in Las Vegas and she's leaving on Saturday. So she's brought up about 3 or 4 times so I just had my law clerk—did you tell her what I told you? I just said tell her that we'll deal with it on Friday. That we're not going to stand in the way of her going to her conference. My intention is that maybe we'll be done, maybe not. If we're not we'll just see how we look on Friday and we have everybody, all 14 still going, my thought would be we can talk about this more later if you want to talk about it. My thought would be to tell her to go to Las Vegas, do your thing. Come Monday morning excuse her once we know that we've got at least 12 or 13 people left—

[DEFENSE COUNSEL]: Do we know how long she's going to be there?

THE COURT: --and if we find out Monday morning that we're in trouble without her, we may end up having to skip a few days. She's coming back on Wednesday. So the worst case scenario, rather than have a mistrial we'll just skip a couple of days.

[THE STATE]: Have them continue deliberation assuming they started something on a Wednesday instead of on a Monday.

THE COURT: Yes, well I don't know that we need to keep her on if we're going into deliberations. I'm just saying if we're still in trial—

[THE STATE]: If we're still presenting evidence?

THE COURT: I'm really giving you a heads up mainly to tell you about the communication that my clerk told her you know, this won't keep you from going to Las Vegas for your conference, okay.

[DEFENSE COUNSEL]: Thank you.

[DEFENSE CO-COUNSEL]: Thank you.

At the close of proceedings on Wednesday, March 11, the court had another conversation with the parties regarding Juror 18A. One of the parties[2] asked the court about its plans for the juror assuming the trial continued beyond that Friday. The court thought there was a "really good chance that deliberations are going to carry over until Monday," and stated that Juror 18A would not be deliberating if the deliberations started on Friday. Defense counsel stated that he did not want "to cut her," and proposed postponing deliberations until Juror 18A returned from her conference. The court responded that the juror's keynote speech was on Monday, and she would not return until Wednesday. The court told the parties, "I wouldn't hold my breath on her being on the jury."

On Thursday, March 12 at 3:00 p.m., Juror 18A sent a note to the court again expressing her concern that she would not be able to serve on the jury the following Monday, Tuesday, or Wednesday. The juror also stated in her note, "After investing 2 weeks in this trial, I would like to see it through but certainly understand if I am excused." The court notified the parties of this note on the morning of Friday, March 13, before delivering jury instructions and hearing closing arguments. After reading the contents of the note on the record, the court stated its reaction: "I think it is inappropriate to compel her to forego her presentations. So I'm prepared to find that she is unable to perform her service and to place the first alternate in her place. Does anybody need to discuss that

---

[2] The record does not reflect which party initiated this conversation, as the speaker is only identified in the transcript as "UNIDENTIFIED SPEAKER."

briefly?" Defense counsel asked to discuss the situation, and stated that Juror 18A should not be excused. Defense counsel again proposed that deliberations be postponed until the juror returned from her conference. Defense counsel also suggested that deliberations could begin that day (Friday), and could continue late into the night, if necessary.

The court responded that it would be "highly burdensome on the other jurors to have them on hold for several days." Therefore, the court stated that it was exercising its discretion under Maryland Rule 4-312[3] in finding that Juror 18A was "unable to adequately perform jury service" and replacing her with an alternate at the beginning of deliberations. The court noted that it would wait until Monday morning to officially excuse Juror 18A and the second alternate, in case something happened over the weekend that would leave them with less than twelve jurors. In that case, the court would accept defense counsel's proposal to delay deliberations until Juror 18A returned, "but only to avoid a mistrial with 11 or fewer jurors."

At the close of proceedings on Friday, March 13, before deliberations began, the court told Juror 18A to go to her conference, and that she would be excused on Monday morning assuming there were no problems with the other jurors. The court also told Juror 18A not to discuss their conversation with the other jurors. Juror 18A told the court that the other jurors already knew that she was leaving and that she "would probably be

---

[3] Rule 4-312(g)(3) provides, in part, "At any time before the jury retires to consider its verdict, the trial judge may replace any jury member whom the trial judge finds to be unable or disqualified to perform jury service with an alternate in the order of selection set under section (e)."

9

dismissed after today." The court responded that that was fine, as long as she did not tell the other jurors about the back-up plan of potentially delaying deliberations until Thursday. On Monday, March 16, the court officially excused Juror 18A from her service, and replaced her with an alternate.

After approximately five hours of deliberations, the jury convicted Mr. Gupta of first-degree murder. On May 27, 2015, the court sentenced Mr. Gupta to life imprisonment. Mr. Gupta appealed his conviction to the Court of Special Appeals, which affirmed the judgment of the circuit court in a reported opinion issued on April 29, 2016. *Gupta v. State*, 227 Md. App. 718, 749 (2016). On August 19, 2016, we granted Mr. Gupta's petition for a writ of certiorari, limited to the following questions[4]:

> 1. When a judge violates Md. Rule 4-326(d) by communicating an *ex parte* answer to a juror's question that "pertains to the action," without disclosing it to the defendant or any lawyer, can the presumption of prejudice be overcome by adding a new standard of review claiming the judge's *ex parte* answer was not "substantive" enough?
>
> 2. Did the trial court err by not granting pre-trial suppression of Petitioner's custodial interrogation statement after finding he communicated repeated

---

[4] We denied Mr. Gupta's petition as to the following two additional questions:

> Is a defendant's request for a missing evidence/adverse inference jury instruction legally insufficient without a request that jurors be directed to draw an adverse inference, and is the instruction unavailable in the absence of proof that the defense theory of the case solely "depend[s] on" the instruction?

> Did the trial court err by making a threshold ruling that proof the only other possible suspect in the case carried a knife for protection was not relevant to evaluating the credibility of her claim she was "not capable" of stabbing someone?

10

demands for a lawyer to police officers while he was locked-up in a cell just before being interrogated?

*Gupta v. State*, 449 Md. 409 (2016).

## DISCUSSION

**A.** **_Ex Parte Communication Between the Circuit Court and Juror 18A_**

Mr. Gupta argues that the circuit court violated Maryland Rule 4-326(d)(2)(C) when it told Juror 18A that she would not miss her conference without first informing the parties of the communication and providing them an opportunity for input. Mr. Gupta asserts that the State has not met its burden of showing that this *ex parte* communication was harmless beyond a reasonable doubt, and therefore he is entitled to a new a trial. The State responds that the circuit court did not violate Rule 4-326(d)(2)(C) because the communication did not "pertain to the action." Alternatively, the State asserts that even if the circuit court did violate the Rule, the violation was harmless beyond a reasonable doubt because Juror 18A did not participate in deliberations, and therefore could not have affected the outcome of the trial.

Rule 4-326(d)(2) governs communications between the court and jurors:

(A) A court official or employee who receives any written or oral communication from the jury or a juror shall immediately notify the presiding judge of the communication.

(B) The judge shall determine whether the communication pertains to the action. If the judge determines that the communication does not pertain to the action, the judge may respond as he or she deems appropriate.

(C) If the judge determines that the communication pertains to the action, the judge shall promptly, and before responding to the communication, direct that the parties be notified of the communication and invite and consider, on

11

the record, the parties' position on any response.  The judge may respond to the communication in writing or orally in open court on the record.

The parties do not dispute that the communication between the trial judge's law clerk and Juror 18A about whether she would be able to attend her conference is governed by this Rule.[5]  Instead, the parties dispute whether the communication "pertain[ed] to the action," such that the trial judge was required to follow the procedures outlined in paragraph (C), or whether the communication did not "pertain to the action," such that the trial judge was free to "respond as he . . . deem[ed] appropriate" under paragraph (B).

Mr. Gupta argues that the communication pertained to the action because it concerned Juror 18A's ability to continue serving on the jury and eventually deliberate. The State contends that the communication did not pertain to the action because it concerned a "routine administrative matter" regarding "a possible future scheduling problem," rather than a "substantive discussion of trial matters [as] contemplated by the [R]ule."

"[C]ommunications raising issues that 'implicate and concern the juror's ability to continue deliberating' pertain[] to the action" under Rule 4-326(d)(2).  *Grade v. State*, 431 Md. 85, 100 (2013) (quoting *State v. Harris*, 428 Md. 700, 715 (2012)).  For example, in *Harris*, the trial judge's secretary received a phone call from a juror's father, informing her that the juror's grandmother had passed away.  428 Md. at 705–06.  Without notifying

---

[5] Although the Rule discusses communications between "the judge" and jurors, this Court has previously held "that Rule 4-326(d) extends to communications between jurors and court personnel." *State v. Harris*, 428 Md. 700, 714 (2012).  Therefore, the communication between Juror 18A and the trial judge's law clerk falls within the purview of the Rule.

12

counsel of the phone call, the secretary informed the juror of his grandmother's death, and asked him "whether he was alright to continue" serving on the jury. *Id.* at 706. The juror responded that he was. *Id.* Shortly after the start of deliberations, the juror sent a note to the court asking to be excused so that he could help his family with preparations for his grandmother's funeral. *Id.* The court informed the parties of the juror's note, and refused to discharge the juror. *Id.* at 709. After a few hours of deliberations, the jury acquitted the defendant of second-degree specific intent murder, but convicted him of second-degree depraved heart murder. *Id.* This Court held that the communication between the judge's secretary and the juror pertained to the action because it involved "[i]nformation that implicates, and may impact, a juror's ability to continue deliberation." *Id.* at 716. Such information is especially relevant when "the juror suggests that his or her ability to continue is dependent upon a speedy conclusion of the trial." *Id.*

In *Grade*, the trial court told the jury, including the alternates, to return to the courthouse at 9:15 a.m. the next day to begin deliberations. 431 Md. at 88. Assuming everyone showed up, the court stated it would dismiss the alternates at that time. *Id.* The next morning, the court received a phone call from one of the jurors stating that she would not be able to get to the courthouse until 10:30 a.m. at the earliest. *Id.* at 89. Without informing the parties of the communication, the court elected to replace the juror with an alternate, rather than delay deliberations until she arrived. *Id.* This Court held that the communication "[fell] squarely within the ambit of Rule 4-326(d)" because "it was a communication directed to the court, about a subject, the effect of which, if acted on, could,

13

or would, affect the make-up of the fact-finding panel as determined by the parties and, in fact, it was later acted on with that very effect." *Id.* at 100–01.

Similarly, in this case, Juror 18A's communication with the trial judge's law clerk about the progress of the trial and her conflict with serving beyond two weeks implicated her ability to continue serving and to deliberate. As in *Harris*, her "ability to continue [was] dependent upon a speedy conclusion of the trial," *Harris*, 428 Md. at 716, because she would only be able to deliberate if the presentation of evidence concluded well before the end of the second week of trial. Also, as in *Grade*, Juror 18A's inquiry "was a communication directed to the court, about a subject, the effect of which, if acted on, could, or would, affect the make-up of the fact-finding panel as determined by the parties and, in fact, it was later acted on with that very effect." *Grade*, 431 Md. at 101. Therefore, we conclude, as we did in *Harris* and *Grade*, that Juror 18A's inquiry about what would happen if the trial continued into a third week "falls squarely within the ambit of Rule 4-326(d)." *Grade*, 431 Md. at 100.

Because the juror's communication pertained to the action, the circuit court was required to adhere to the procedures outlined in Rule 4-326(d)(2)(C). *See Winder v. State*, 362 Md. 275, 322 (2001) ("These rules are not abstract guides. They are mandatory and must be strictly followed."). This means the trial judge was required, **before responding to the communication**, to promptly notify the parties; to consider, on the record, the parties' position on any response; and to respond to the communication in writing or orally on the record. Md. Rule 4-326(d)(2)(C); *see also Harris*, 428 Md. at 720 ("The mandate

14

of Rule 4-326(d) is unambiguous[.]").  These procedures "are basic and relatively simple to adhere to in practice."  *Winder*, 362 Md. at 322.

The record reveals, and the parties do not dispute, that the trial judge did not adhere to the mandates of Rule 4-326(d)(2)(C).  He did not notify the parties of Juror 18A's inquiry before responding through his law clerk.  He did not invite and consider, on the record, the parties' position on any response.  Finally, he did not respond to the communication either in writing or orally on the record.  Instead, the trial judge responded to the juror, off the record, through his law clerk, "[t]hat we're not going to stand in the way of her going to her conference," and informed the parties of the conversation the next business day.  Therefore, the trial judge violated Rule 4-326(d)(2)(C).

"A failure to comply with [the Rule's] explicit mandate is error, and once such error is established, it only remains for this Court to determine whether that error was prejudicial to the defendant and, thus, requires reversal."  *Harris*, 428 Md. at 720 (citing *Taylor v. State*, 352 Md. 338, 354 (1998)).  Mr. Gupta argues that the trial judge's violation of the Rule was prejudicial because it deprived him of the right to have notice of the evolving situation with Juror 18A and an opportunity to provide input before the judge responded to the juror's inquiry.  Additionally, Mr. Gupta notes that it is the State's burden to establish that the violation was not prejudicial, and he maintains that the State is unable to satisfy that burden based on the record before us.  The State responds that any potential violation of the Rule was, "by definition," harmless because Juror 18A was dismissed and replaced with an alternate before deliberations began.  Therefore, the State asserts, "it was impossible" for the alleged violation to have harmed Mr. Gupta.

15

"Any failure of the trial court to disclose a communication under Rule 4-326(d) is evaluated under the harmless error standard and will not be considered harmless 'unless the record affirmatively shows that such communications were not prejudicial or had no tendency to influence the verdict of the jury.'" *Ogundipe v. State*, 424 Md. 58, 74 (2011) (quoting *Denicolis v. State*, 378 Md. 646, 656 (2003)).

> "As the beneficiary of the error, the State has the burden of establishing that it was not prejudicial," and "[a] reversal of the . . . conviction is required unless the record demonstrates that the trial court's error in communicating with the jury *ex parte* did not prejudice the [defendant]." [*Taylor*, 352 Md. at 354.] Stated differently, it is error for a trial court to engage in a communication with the jury, or jurors, off the record, and without notification to counsel, and that error is presumably prejudicial unless the State can affirmatively prove otherwise.

*Harris*, 428 Md. at 721 (alterations and ellipsis in original); *see also Denicolis*, 378 Md. at 658–59 ("Once error is established, the burden is on the State to show that it was harmless beyond a reasonable doubt. The record must affirmatively show that the communication (or response or lack of response) was not prejudicial.").

At the outset, we reject the State's suggestion that a trial court can cure the presumed prejudice that arises from its *ex parte* communications with a juror by simply dismissing the "infected" juror and replacing her with an alternate. Of course, we recognize that "while [a defendant] has a right to a fair and impartial jury, [he] does not have a right to a jury composed of particular individuals." *State v. Cook*, 338 Md. 598, 614 (1995). As such, "[a] defendant's 'valued right to have his trial completed by a particular tribunal' should not be expanded to apply to a situation where a seated juror is replaced with an alternate who has undergone the same selection process as the seated jurors and has been

16

present for the entire trial." *Id.* We also recognize "that a trial judge has discretion, pursuant to [Rule 4-312(g)(3)], to make a juror substitution, to replace a juror with an alternate before deliberation, if that juror" is unable to perform her duty. *Grade*, 431 Md. at 102.

However, the trial judge's discretion, pursuant to Rule 4-312(g)(3), even if exercised appropriately, does not automatically render harmless the judge's violation of the prohibition against *ex parte* communications. *See id.* at 103 ("Where . . . more than one Rule addresses the same issue, neither overlapping Rule may be relied on, alone, to permit the trial court to fail to comply with all other applicable rules.").

> Where there is a triggering juror communication, compliance with Rule 4-326(d) neither infringes nor affects the trial judge's responsibility or exercise of discretion under Rule [4-312(g)(3)]. On the other hand, a trial court's failure to follow Rule 4-326(d) undermines and, indeed, renders nugatory the defendant's right, vindicated by that Rule, to be present at all stages of trial.

*Id.* at 104. Therefore, the fact that Juror 18A did not engage in deliberations, because she was dismissed pursuant to Rule 4-312(g)(3), is insufficient to establish that the trial judge's violation of Rule 4-326(d)(2)(C) was harmless beyond a reasonable doubt.

Instead, we must look to the record of what transpired in the circuit court to determine whether it "affirmatively show[s] that the communication (or response or lack of response) was not prejudicial." *Denicolis*, 378 Md. at 659. The record reveals that the trial judge first notified the parties of the *ex parte* communication with Juror 18A during an afternoon recess on Monday, March 9—the second Monday of the trial. At that time, the judge revealed that Juror 18A was concerned about the trial continuing beyond the end of that week, because she was leaving town that Saturday to attend a conference in Las

17

Vegas and would not return until the following Wednesday. The judge also expressed a mistaken belief that the juror had mentioned this conflict during voir dire, when in fact the juror had not previously mentioned her conference on the record. Furthermore, the judge explained that he had already responded to the juror's inquiry, through his law clerk, by telling her that "we're not going to stand in the way of her going to her conference." Finally, the judge stated that he would resolve the situation on Friday, depending on the progress of the trial at that point.

The record reveals that the parties had another conversation with the court regarding Juror 18A on Wednesday, March 11, during which defense counsel suggested postponing deliberations until the juror returned from her conference. On Thursday, March 12, Juror 18A sent a note to the court expressing her concern about the trial going into a third week, which the court read to the parties the next day. At that time, the court expressed that it was prepared to dismiss Juror 18A and replace her with an alternate, but asked the parties if they wanted to discuss this decision. Defense counsel expressed his disapproval with the court's decision, and suggested either postponing deliberations until the juror returned from her conference, or starting deliberations that day and going late into the night. The court considered and rejected these options, ultimately choosing to dismiss Juror 18A and replace her with an alternate as previously stated.

Based on our review of this record, we hold that the trial judge's violation of Rule 4-326(d)(2)(C) was harmless beyond a reasonable doubt. We recognize that, prior to the Court of Special Appeals' opinion below, "no reported Maryland appellate case [had] held that the State met its burden of proving that a trial court's *ex parte* communication with a

18

juror was harmless." *Gupta*, 227 Md. App. at 728. However, we conclude, as did the intermediate appellate court, that this case is materially distinguishable from those previous cases.

For example, in *Harris*, the defendant was prejudiced by the *ex parte* communication because he and his counsel were "not provided with the opportunity to evaluate the emotional state of the juror, nor to provide input on how to proceed." *Harris*, 428 Md. at 722. In that case, "had the communication been disclosed when it occurred, the alternate jurors would have been available to replace the juror. The trial court, by waiting until the alternates were dismissed to advise the respondent and the State of the subject communication, limited the available options." *Id.* Here, Mr. Gupta and his counsel did not need "to evaluate the emotional state of the juror," because Juror 18A's potential inability to continue serving related to a scheduling conflict rather than her mental stability. Moreover, unlike in *Harris*, Mr. Gupta and his counsel were not denied an opportunity "to provide input on how to proceed." *See id.* Although the parties were not informed of Juror 18A's inquiry before the court responded to it, as required by Rule 4-326(d)(2)(C), they were informed at a time when the court still had options before it regarding how to resolve the situation, and the parties had the opportunity to provide their input on those options. In fact, defense counsel provided his input to the circuit court on three separate occasions after being informed of the communication, but before the court made its decision to dismiss the juror.

Similarly, in *Grade*, the defendant was prejudiced by the *ex parte* communication because it resulted in the judge dismissing a juror and replacing her with an alternate

19

without receiving input from the parties. *See Grade*, 431 Md. at 105 ("The notification of counsel and their opportunity to have input are missing from the case at bar."). Here, although the circuit court ultimately rejected defense counsel's proposals for how to resolve Juror 18A's scheduling conflict, its decision to dismiss the juror and replace her with an alternate was only made *after* considering and rejecting those proposals on the record. We conclude that defense counsel's multiple opportunities to provide input on how to address the situation with Juror 18A, and the circuit court's acknowledgement on the record that it considered and rejected defense counsel's suggestions, are sufficient to distinguish this case from cases like *Grade* and *Harris*, where no such input occurred. Furthermore, because both parties were provided an opportunity to offer input on how to resolve the situation before the court made its ultimate decision to dismiss Juror 18A, we cannot see how Mr. Gupta was prejudiced by the delay of one business day in being notified about the initial communication between the juror and the judge's law clerk.

Therefore, we hold that the State has satisfied its burden of establishing that the trial judge's violation of Rule 4-326(d)(2)(C) was harmless beyond a reasonable doubt. However, we reiterate that "[t]he rules governing communications between the judge and the jury are basic and relatively simple to adhere to in practice." *Winder*, 362 Md. at 322. "These rules are not abstract guides. They are mandatory and must be strictly followed." *Id.* Thus, "a court that communicates with jurors without first bringing the parties together in open court and obtaining their input skates on ice that can be dangerously thin." *Gupta*, 227 Md. App. at 737. So while we hold that the subsequent opportunities for input were sufficient, on the facts of this case, to show that Mr. Gupta was not prejudiced by the *ex*

20

*parte* communication, we note that the better practice for the circuit court would have been to inform the parties of the juror's inquiry before providing a response, as required by the Rule.

**B.      *Motion to Suppress Based on Violation of Miranda Right to Counsel***

Mr. Gupta argues that the circuit court erred in denying his motion to suppress his statements to the detectives who interrogated him the morning of the murder because those statements were obtained in violation of his Fifth Amendment right to have counsel present during questioning by the police under *Miranda*.  Mr. Gupta asserts that the detectives violated this right by interrogating him after he made repeated demands for a lawyer from his holding cell before the interrogation began.  The State responds that any purported *Miranda* violation in obtaining the statements was harmless because the statements were not admitted into evidence at trial.  Alternatively, the State argues that there in fact was no violation because Mr. Gupta did not unambiguously invoke his right to have counsel present at any time during the detectives' interrogation.

This Court reviews a circuit court's denial of a motion to suppress based on "only the evidence contained in the record of the suppression hearing."  *Rush v. State*, 403 Md. 68, 82–83 (2008).

> The factual findings of the suppression court and its conclusions regarding the credibility of testimony are accepted unless clearly erroneous. We review the evidence and the inferences that may be reasonably drawn in the light most favorable to the prevailing party. We "undertake our own independent constitutional appraisal of the record by reviewing the law and applying it to the facts of the present case."

*Id.* at 83 (citations omitted).

21

In *Miranda v. Arizona*, the Supreme Court held "that a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457 (1994) (citing *Miranda v. Arizona*, 384 U.S. 436, 469–73 (1966)). These rights stem from "the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination." *Edwards v. Arizona*, 451 U.S. 477, 481 (1981) (citing *Miranda*, 384 U.S. at 479). "Custodial interrogation" is questioning initiated by law enforcement officers, or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnote omitted); *Miranda*, 384 U.S. at 444.

"If the suspect effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Davis*, 512 U.S. at 458 (citing *North Carolina v. Butler*, 441 U.S. 369, 372–76 (1979)). The State can establish an effective waiver of *Miranda* by showing "that a *Miranda* warning was given and that it was understood by the accused," followed by an uncoerced statement by the accused. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). "But if a suspect requests counsel at any time **during the interview**, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458 (emphasis added) (citing *Edwards*, 451 U.S. at 484–85).

The suspect's invocation of the right to have counsel present must be unambiguous. *Id.* at 459. This "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. Unless the police adhere to these procedural safeguards, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant." *Miranda*, 384 U.S. at 444.

At the suppression hearing in this case, the circuit court found that Mr. Gupta demanded to see a lawyer "two to four times" while he was in the holding cell awaiting interrogation. The circuit court concluded that these demands did not qualify as an invocation of the right to counsel under *Miranda* because they did not occur "in the context of custodial interrogation," but rather "while in custody before interrogation took place."

Mr. Gupta argues that his demands for a lawyer while in the holding cell prior to interrogation were sufficient to trigger the *Miranda* safeguards because they occurred while he was in custody and interrogation was "imminent." Furthermore, Mr. Gupta asserts that the detectives knew or should have known that he wanted to see a lawyer because the officer who had been monitoring him in the holding cell relayed his requests to the detectives, and because Mr. Gupta responded to being advised of his rights by asking, "When do I get to talk . . ." before being interrupted by Detective Hamill. The State

23

responds that Mr. Gupta's pre-interrogation requests for a lawyer do not constitute an invocation of the right to counsel under *Miranda* because a suspect cannot invoke that right "anticipatorily," outside the context of custodial interrogation. In addition, the State asserts that it is irrelevant whether the detectives knew that Mr. Gupta had been demanding a lawyer before the interrogation began, because nothing prevented him from reasserting those requests after being advised of his *Miranda* rights and subjected to questioning.

In *McNeil v. Wisconsin*, the Supreme Court noted that it had "in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'" 501 U.S. at 182 n.3. The Court also cautioned, "The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect." *Id.* Similarly, this Court has made clear that "in order for the *Miranda* safeguards to take effect, there must first exist 'custodial interrogation.'" *Fenner v. State*, 381 Md. 1, 9 (2004).

Neither the Supreme Court nor this Court has defined what constitutes "the context of custodial interrogation." However, a number of cases in the Court of Special Appeals have addressed the issue of a suspect attempting to invoke his or her *Miranda* rights anticipatorily, so we begin our analysis with an examination of those cases.

First, in *Marr v. State*, the intermediate appellate court noted that "[t]he 'inherent compulsion' that is brought about by the combination of custody and interrogation is crucial for the attachment of *Miranda* rights." 134 Md. App. 152, 173 (2000). The court then quoted the above-quoted language from *McNeil*, and explained that "at least five

24

federal courts of appeal subsequently [] interpreted [this language] to mean that an individual may not invoke the *Miranda* right to counsel before interrogation has begun *or is imminent*." *Id.* at 175 (emphasis added) (citing *United States v. Grimes*, 142 F.3d 1342, 1347–48 (11th Cir. 1998); *United States v. Thompson*, 35 F.3d 100 (2d Cir. 1994); *Alston v. Redman*, 34 F.3d 1237 (3d Cir. 1994); *United States v. LaGrone*, 43 F.3d 332 (7th Cir. 1994); *United States v. Wright*, 962 F.2d 953 (9th Cir. 1992)). After discussing the federal cases, the Court of Special Appeals held that the appellant's purported invocation of his right to counsel occurred before the appellant was in custody, and therefore "could not operate to invoke his Fifth Amendment right to counsel." *Id.* at 178. Based on this holding, the court declined to address "whether, in addition to custody, interrogation must be actual or at least imminent before the right to counsel can be invoked." *Id.*

Next, in *Costley v. State*, the Court of Special Appeals noted that "the language of *McNeil* suggests that custody, absent interrogation, is insufficient." 175 Md. App. 90, 111 (2007). In that case, there was some evidence at the suppression hearing that the appellant had requested to speak to an attorney from the officer who placed him in a holding cell prior to interrogation. *Id.* at 99. Once the interrogation began, the appellant did not reiterate those requests for an attorney. *Id.* Because interrogation was absent at the time the appellant made his requests, the court held that "any request to the officer who placed appellant in a holding cell was ineffective." *Id.* at 112.

The Court of Special Appeals addressed a similar scenario in *Hoerauf v. State*. There, the appellant requested to call his mother, and told officers that his mother was an attorney, several times while in a holding cell prior to interrogation. 178 Md. App. 292,

25

304–05 (2008). The court held that, assuming these requests "clearly expressed [the appellant's] desire for the assistance of counsel," they were nonetheless insufficient to constitute an invocation of his *Miranda* right to counsel. *Id.* at 318. The court noted that "all such requests were made by appellant prior to being placed in the interrogation room and questioned by Detective Sofelkanik," and "at no time from his entry into the interrogation room until the completion of his statement did appellant ask to speak with his mother, or otherwise request the assistance of counsel." *Id.*

Later, in *In re Darryl P.*, the intermediate appellate court reiterated the sentiment of *McNeil* that "[t]he entire package of *Miranda* protections is confined to the special context of custodial interrogation. . . . They may not be invoked anticipatorily." 211 Md. App. 112, 156 (2013). The court also quoted the following statement from Jezic, *Maryland Law of Confessions*, § 12.4: "A suspect's invocation of the *Miranda* right to counsel must be made in the context of custodial interrogation, *or when custodial interrogation is imminent*." *Id.* at 158 (emphasis added). The court did not have occasion to explain or define this phrase, however, because it ultimately held that there was "no indication that the appellant was ever placed in custody in order to be interrogated," and therefore he "never acquired a *Miranda-Edwards* right to counsel in the first place." *Id.*

Most recently, in *Williams v. State*, the Court of Special Appeals held—for the first time—that the appellant's *Miranda* rights had attached even though "actual interrogation had not yet commenced." 219 Md. App. 295, 322 (2014), *aff'd on other grounds*, 445 Md. 452 (2015). In that case, the appellant stated to detectives, "I don't want to say nothing. I don't know . . ." before being interrupted by the detectives. *Id.* at 309. At the time he made

this comment, the appellant had already been taken into the interrogation room and the detectives had begun asking questions, but the questions did not constitute interrogation because they were not designed to illicit an incriminating response. *Id.* at 322. In addition, one detective had told the appellant multiple times that they would be reading him his *Miranda* rights, because that was a formality that they had to go through before they could begin talking. *Id.*

The *Williams* court distinguished these facts from those in *Costley* and *Hoerauf* because "these circumstances present the 'compelling atmosphere'—and its corresponding danger of 'inherent compulsion'—that the *Miranda* prophylaxis was expressly designed to guard against." *Id.* (citing *Marr*, 134 Md. App. at 173); *see also id.* (characterizing the holding in *Hoerauf* as, "where the suspect *does not* invoke his *Miranda* right after 'his entry into the interrogation room,' his prior invocation *was not* valid, *i.e.*, such invocation was not made in the context of custodial interrogation"). Therefore, the intermediate appellate court concluded "that appellant's comment was made 'in the context of custodial interrogation.'" *Id.* at 322–23 (quoting *McNeil*, 501 U.S. at 182 n.3).

On appeal, this Court affirmed the Court of Special Appeals' judgment in *Williams*, but did not address whether the appellant's comment occurred in the context of custodial interrogation. 445 Md. at 483. Instead, we "assum[ed] for the sake of our analysis that in the instant case *Miranda* rights were implicated," *id.* at 475, but held that the appellant's comment nonetheless was insufficient to invoke his right to remain silent, because the comment was ambiguous. *Id.* at 477. Three judges dissented, believing that the appellant's comment was not ambiguous. *Id.* at 484 (McDonald, J., dissenting). In reaching its

27

conclusion, the dissent agreed with the reasoning of the Court of Special Appeals that the comment "was made in the context of custodial interrogation." *Id.* at 486.

Our review of these cases reveals that this Court has never squarely addressed the meaning of "the context of custodial interrogation" or the circumstances under which interrogation may be said to be "imminent." Similarly, while the Court of Special Appeals has addressed these concepts on a number of occasions, it has yet to provide a precise definition for these terms.

Here, we again decline to offer a precise definition for "the context of custodial interrogation," because a precise definition is unnecessary to resolve the question presented on the facts of this case. Thus, we hold that, while there may be some instances in which a suspect could invoke his *Miranda* rights post-custody but pre-interrogation, *see, e.g.*, *Williams*, 219 Md. App. at 322, this case falls well outside the scope of any permissible definition of "imminence" in the sense of an impending interrogation.

As in *Costley* and *Hoerauf*, Mr. Gupta's requests for a lawyer came when he was still in a holding cell, before any interrogation had taken place. The requests were made to an officer who was guarding him, rather than the detectives who later questioned him (although the officer did relay the message to the detectives). At no time after entering the interrogation room until the end of the fifty-five-minute interrogation did Mr. Gupta ask for the assistance of counsel. *See Hoerauf*, 178 Md. App. at 318.

Furthermore, Mr. Gupta's requests for a lawyer occurred at 5:05 a.m., according to Officer Richardson. Detectives Hamill and Fumagalli arrived between ten and thirty minutes later, and the interrogation did not begin until a full three hours after Mr. Gupta

exclaimed his demands from the holding cell. This is not, in any sense of the word, "imminent." It is irrelevant whether the detectives knew that Mr. Gupta had been asking for a lawyer before the interrogation began, because the *Miranda* rights to counsel and to silence "must be asserted when the government seeks to take the action they protect against." *McNeil*, 501 U.S. at 182 n.3. Therefore, we hold that Mr. Gupta's requests to see a lawyer, made while in a holding cell prior to interrogation, were made outside the context of custodial interrogation, and thus did not constitute an invocation of his *Miranda* right to counsel.

Finally, we address Mr. Gupta's contention that his asking, "When do I get to talk . . .," before being interrupted by Detective Hamill is somehow relevant to whether his pre-interrogation comments served as an invocation of *Miranda*. The parties do not dispute that at the time this statement was made (unlike the earlier statements), Mr. Gupta was subjected to custodial interrogation, and therefore his *Miranda* rights had attached. At that point, the detectives had taken him into the interrogation room, they had asked him questions about his background and present state of mind, and they had read him his *Miranda* rights.

But to the extent Mr. Gupta contends that this statement affects whether his pre-interrogation comments served to invoke his *Miranda* right to counsel, we reject that contention. We reiterate that, regardless of what the detectives knew before the interrogation began, Mr. Gupta was still required to assert his desire to have counsel present *after* his rights had attached, or "when the government seeks to take the action they protect against." *McNeil*, 501 U.S. at 182 n.3.

29

Additionally, to the extent Mr. Gupta contends that this statement was itself an invocation of his *Miranda* right to counsel, we reject that contention as well. Even if we were to assume that Mr. Gupta would have finished his question, "When do I get to talk . . .," by asking for a lawyer, and not Ms. Gould, his parents, or anyone else, this still would not have been the type of unambiguous expression of a desire to have counsel present that the Supreme Court and our precedents require. *See Davis*, 512 U.S. at 459 ("[The suspect] must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."); *Ballard v. State*, 420 Md. 480, 491 (2011) ("In short, if, from the perspective of a reasonable officer, the suspect's statement is not an unambiguous or unequivocal request for counsel, then the officers have no obligation to stop questioning him."). At most, if the detectives knew that Mr. Gupta was going to finish his question by asking about a lawyer, it would have been "good police practice for the interviewing officers to clarify whether or not he actually want[ed] an attorney," but detectives are not required to ask such "clarifying questions." *Davis*, 512 U.S. at 461; *see also Ballard*, 420 Md. at 490 (citing *Davis*, 512 U.S. at 461). And while we recognize that Mr. Gupta was cutoff mid-sentence by Detective Hamill, so that we have no way of knowing what he was going to say, nothing prevented Mr. Gupta from requesting a lawyer at any other time during the fifty-five-minute interrogation. If he wanted the assistance of counsel before speaking to the detectives, he had many opportunities to say so.

Instead, we conclude that Mr. Gupta's actions after stating that he understood his *Miranda* rights—cooperating with the detectives and answering their questions—

constitute an implicit waiver of those rights. *Cf. Berghuis*, 560 U.S. at 384 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."). Accordingly, Mr. Gupta's statements to Detectives Hamill and Fumagalli were not obtained in violation of *Miranda*.

Because Mr. Gupta did not invoke his *Miranda* right to have counsel present at any time during his interrogation, we hold that the circuit court did not err in denying his motion to suppress the statements he made to detectives during that interrogation. Having found no error, we need not reach the State's argument that any purported error was harmless.

## CONCLUSION

In summary, we hold that the circuit court erred when it responded to a juror's inquiry off the record without first notifying the parties of the communication and providing them an opportunity for input, as required by Rule 4-326(d)(2)(C). However, this error was harmless because the circuit court did subsequently provide the parties an opportunity for input, and considered defense counsel's proposals on the record, before finally acting on the juror's inquiry by dismissing that juror before deliberations. In addition, we hold that the circuit court did not err in denying Mr. Gupta's motion to suppress the statements he made to detectives during his interrogation, because Mr. Gupta did not unambiguously assert his *Miranda* right to have counsel present at any time during the interrogation. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

31

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2016

RAHUL GUPTA

v.

STATE OF MARYLAND

Barbera, C.J.
Greene
Adkins
McDonald
Hotten
Getty
Rodowsky, Lawrence F.
  (Senior Judge, Specially Assigned),

JJ.

Concurring Opinion by Adkins, J., which
Barbera, C.J., and McDonald, J., join.

Filed: March 24, 2017

Respectfully, I concur with the judgment of the Majority, but disagree with its analysis of the *Miranda* issue. I would not reach the question of whether Mr. Gupta's *Miranda* right to counsel was violated because even if it were, the statements he seeks to suppress were never admitted during his trial. More importantly, I write separately because in addressing the merits of this issue, the Majority validates interrogation practices that erode suspects' *Miranda* rights.

The remedy for a *Miranda* violation is to deny the State the ability to use the defendant's statements in its case in chief, but the statements may still be used to impeach the defendant. *Oregon v. Hass*, 420 U.S. 714, 722–23 (1975); *Harris v. New York*, 401 U.S. 222, 224–26 (1971). Here, Mr. Gupta's interrogation statements were only used to impeach him during cross-examination, which would have been permitted even if the trial court had suppressed the statements he made during the interrogation. Any controversy that existed due to the denial of Mr. Gupta's motion to suppress was mooted when the statements were only used to impeach him. Therefore, it is not necessary to address the merits of Mr. Gupta's contentions.

I am concerned that through its analysis of Mr. Gupta's arguments the Majority opinion will encourage interrogation practices that infringe on suspects' *Miranda* rights. Mr. Gupta claims that he was attempting to invoke his *Miranda* right to counsel when he was interrupted mid-sentence by Detective Hamill. Regarding this conduct, the Majority concludes that "nothing prevented Mr. Gupta from requesting a lawyer at any other time during the fifty-five-minute interrogation. If he wanted the assistance of counsel before speaking to the detectives, he had many opportunities to say so." Maj. Slip Op. at 30. The

Majority's conclusion overlooks the fact that interruption, in general, is a common police interrogation technique. *See* Saul M. Kassin et al., *Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs*, 31 Law & Hum. Behav. 381 (2007). This technique is taught in one of the most widely used police officer training programs. *Critics Corner: The Reid Technique*,[1] John E. Reid & Assocs., Inc., https://www.reid.com/educational_info/critictechnique.html (last visited March 15, 2017) [https://perma.cc/7KEY-86U5]; *see also* Kassin, *supra*, at 388. Indeed, according to one study, "[i]nterrupting a suspect's denials and objections" is the eighth most commonly used interrogation technique. Kassin, *supra*, at 389. Detective Hamill even testified at the suppression hearing that interrupting a suspect is her "methodology."

Although the interruption methodology is effective and acceptable, it should not be used it to hamper individuals' exercise of their *Miranda* rights. *Miranda* warnings exist as a counterbalance to the coercive atmosphere of custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467–70 (1966). A defendant invokes his right to an attorney if he "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). In applying the reasonable police officer standard, this Court has examined both the statement and the context in which it was made. *See Williams v. State*, 445 Md. 452, 476–77 (2015) (analyzing the statement

---

[1] The U.S. Supreme Court discussed several aspects of The Reid Technique in *Miranda v. Arizona*, 384 U.S. 436 (1966), to illustrate the psychological coercion used in police interrogations. *Id.* at 448–55.

"I don't want to say nothing. I don't know" in isolation and as part of an "extended colloquy"); *Ballard v. State*, 420 Md. 480, 493–94 (2011). In *Ballard*, we held that a reasonable officer in the same circumstances would understand the statement "You mind if I say no more and just talk to an attorney about this" to be an unambiguous request for counsel. *Ballard*, 420 Md. at 493–94. Although we concluded that the statement alone was sufficient to invoke the suspect's *Miranda* right to counsel, we found that the detective's follow-up question, "What benefit is that going to have?" and the suspect's response, "I'd feel more comfortable with one," bolstered our holding. *Id.* at 494. Using a similar approach to the one we used in *Ballard*, the Georgia Supreme Court held that a criminal defendant invoked his right to remain silent even though a police officer interrupted him after he said, "I don't want to talk . . . ." *Green v. State*, 570 S.E.2d 207, 210 (Ga. 2002). It explained, "[W]hatever the proper definition **of a 'reasonable police officer' might be, that phrase must contemplate interrogators who are not actively seeking to interrupt and/or ignore the suspect's assertion of rights.**" *Id.* at n.10 (emphasis added). I agree.

Here, given when the interruption occurred—seconds after Detective Hamill finished reading Mr. Gupta his *Miranda* rights—a reasonable police officer would have understood that when Mr. Gupta began saying, "When do I get to talk . . . ," he was attempting to assert his rights. Even if a reasonable officer may have been unsure whether this was an attempted invocation, Mr. Gupta's pre-interrogation requests for counsel resolve any ambiguity. Although Detective Hamill did not remember whether she was told about Mr. Gupta's prior requests, Detective Fumagalli, who was also in the room, testified

3

that she was aware of them. When asked whether she knew if there was a "substantial probability" that Mr. Gupta was going to ask for a lawyer if she did not cut him off, even Detective Hamill acknowledged that "it certainly is a possibility." The timing—only seconds after finishing the *Miranda* warnings—and this testimony, undercut the Majority's assertion that "nothing prevented Mr. Gupta from requesting a lawyer at any other time during the . . . interrogation" because her own methodology, if repeated, may have done just that. Maj. Slip Op. at 30.

Chief Judge Barbera and Judge McDonald have authorized me to state that they agree with the views set forth in herein.